

U. S. COURT OF APPEALS

# UNITED STATES COURT OF APPEALS F I L E D

### FOR THE FIFTH CIRCUIT

APR 1 9 1999

---

No. 97-31190

---

D.C. Docket No. 96-CV-2430

CHARLES R. FULBRUGE III
CLERK

**FILED**

USDC, WESTERN DISTRICT OF LA
ROBERT H. SHEMWELL, CLERK

DATE __6 , 25 , 99__
BY ____BCH____

CARGILL INCORPORATED; GENERAL CHEMICAL CORPORATION;
MISSISSIPPI LIME MANAGEMENT COMPANY; MORTON INTERNATIONAL;
OCI OF WYOMING; LONNY BADEAUX; JOSEPH VENDETTI; METHANE
AWARENESS RESOURCE GROUP; DIESEL COALITION

Plaintiffs - Appellants

v.

UNITED STATES OF AMERICA; DONNA E SHALALA, SECRETARY,
DEPARTMENT OF HEALTH & HUMAN SERVICES, LINDA ROSENSTOCK,
Director, National Institute for Occupational Safety and Health;
RICHARD KLAUSNER, Director, National Cancer Institute;

Defendants - Appellees

Appeal from the United States District Court for the
Western District of Louisiana, Lafayette.

Before DAVIS, SMITH, and WIENER, Circuit Judges.

## J U D G M E N T

This cause came on to be heard on the record on appeal and
was argued by counsel.

ON CONSIDERATION WHEREOF, it is now here ordered and adjudged
by this Court that the judgment of the District Court in this cause
is affirmed in part and reversed in part, and the cause is remanded
to the District Court for further proceedings in accordance with the
opinion of this Court.

IT IS FURTHER ORDERED that each party bear its own costs on
appeal.

ISSUED AS MANDATE:      JUN 2 4 1999

A true copy
Test

Clerk, U. S. Court of Appeals, Fifth Circuit
6-24-99
By _____
Deputy

New Orleans, Louisiana

COPY SENT
DATE 6/25/99
BY BCH
TO: RTH
     Rita Weller
     Shannon McBride

67

U.S. COURT OF APPEALS
**FILED**

**IN THE UNITED STATES COURT OF APPEALS**

**FOR THE FIFTH CIRCUIT**

APR 1 9 1999

CHARLES R. FULBRUGE III
CLERK

No. 97-31190

CARGILL, INCORPORATED; GENERAL CHEMICAL CORPORATION;
MISSISSIPPI LIME MANAGEMENT COMPANY; MORTON INTERNATIONAL;
OCI OF WYOMING; LONNY BADEAUX; JOSEPH VENDETTI;
METHANE AWARENESS RESOURCE GROUP;
and
DIESEL COALITION,

Plaintiffs-Appellants,

VERSUS

UNITED STATES OF AMERICA; DONNA E. SHALALA,
Secretary, Department of Health and Human Services;
LINDA ROSENSTOCK,
Director, National Institute for Occupational Safety and Health;
RICHARD KLAUSNER,
Director, National Cancer Institute,

Defendants-Appellees.

Appeal from the United States District Court
for the Western District of Louisiana

Before DAVIS, SMITH, and WIENER, Circuit Judges.

JERRY E. SMITH, Circuit Judge:

Plaintiffs Cargill, Incorporated, General Chemical Corpora-
tion, Mississippi Lime Management Company, Morton International,
OCI of Wyoming, Lonny Badeaux, Joseph Vendetti, the Methane
Awareness Resource Group, and the Diesel Coalition, which we refer

to collectively as "MARG,"[1] appeal the denial of injunctive and declaratory relief from alleged violations of the Federal Advisory Committee Act ("FACA"), 5 U.S.C. App. 2.   MARG claims that the National Institute for Occupational Safety and Health ("NIOSH") and the other defendants violated FACA and its implementing regulations by employing NIOSH's Board of Scientific Counselors ("BSC") to peer-review the protocol to govern a planned study of the health effects of exposure to diesel exhaust.   We affirm in part, reverse in part, and remand.

## I.

In 1992, NIOSH began evaluating the feasibility of a study to determine and quantify the correlation, if any, between exposure to diesel exhaust and adverse health effects in underground miners. In August 1995, NIOSH released a draft protocol and feasibility assessment indicating its intent to study, over seven years, fourteen mines, including some operated by members of MARG.

Because of the complexity of collecting long-term exposure and health data and isolating the effects of past diesel exposure from the effects of exposure to tobacco and other agents, NIOSH realized that it needed experts to provide peer review of the protocol and, in particular, advice from experts in diesel exhaust, diesel

---

[1] "MARG" is an abbreviation for "Methane Awareness Resource Group," a coalition of mine owners.  When this litigation began, MARG was the first-named plaintiff, and the briefs refer to the plaintiffs as "MARG."

exposure assessment, and the mining environment.[2]  Accordingly, it circulated a letter to interested parties and, on November 27, 1995, convened a public meeting of the peer review panel at which a number of independent scientists, including some representing MARG members, severely criticized the protocol.

Concerned that the diesel study was not being adequately reviewed by a balanced and impartial group, and worried that a flawed protocol would yield misleading results justifying unnecessarily strict regulations, MARG sued for declaratory and injunctive relief under FACA, averring that the peer review panel was an "advisory committee" for purposes of FACA and was not in compliance with it.  Agreeing with MARG, the district court enjoined further meetings of the peer review panel until FACA's requirements were met.  The court stated that complying with FACA "should not be that difficult" and told NIOSH that the agency could either appeal the ruling or "go ahead and proceed with the formalities procedurally and form this committee according to statute."

Purporting to do the latter, NIOSH called on the BSC to peer-review the study protocol.  According to its charter, BSC "provide[s] guidance to the Director, [NIOSH], on [NIOSH] research

---

[2] The August 1995 draft protocol stated:

An external advisory committee will be established to provide advice and to monitor the activities of the study.  This panel will consist of scientists with expertise in various areas, including, but not necessarily limited to: epidemiologic methods; carcinogenicity of diesel exhaust; diesel exhaust monitoring methodology; retrospective exposure assessment; biomarkers of exposure; and the mining environment and operation.  This committee will also serve as the NIOSH Peer Review Panel, and meet periodically to review study progress and comment on procedures, methods, analysis, and reports as the project advances.

programs." NIOSH sent the protocol to members of BSC for review in December 1996, and BSC considered the protocol at a meeting held January 14, 1997.

Unconvinced that BSC meets FACA's requirements, MARG moved on December 30, 1996, to amend its complaint and for the court to enjoin further use of the diesel protocol until the protocol has been reviewed by a properly constituted peer review group. After an evidentiary hearing, the court decided that BSC is "in compliance with all applicable procedural requirements," that "any past violations of the applicable substantive requirements have been cured," and that BSC is in "substantial compliance" with "all applicable regulations."

BSC continued its peer review at subsequent meetings. NIOSH is now in the early stages of using the peer-review work product in a data collection effort that, under the protocol, is projected to last several years.

## II.

MARG claims that NIOSH violated FACA's congressional filing requirements by filing BSC's charter with the wrong congressional committee. Reviewing *de novo* the district court's conclusion to the contrary, *see Reich v. Lancaster*, 55 F.3d 1034, 1045 (5th Cir. 1995), we agree and reverse the determination that NIOSH complied with FACA's filing requirements.

FACA provides that "[n]o advisory committee shall meet or take any action until an advisory committee charter has been filed . . .

4

with the head of the agency to whom any advisory committee reports and with the standing committees of the Senate and of the House of Representatives having legislative jurisdiction of such agency." 5 U.S.C. App. 2 § 9(c)(2).   NIOSH filed BSC's charter with the House Committee on Commerce, the committee having jurisdiction over the Department of Health and Human Services ("HHS").   NIOSH reasoned that because the agency is located within HHS, filing with the committee having jurisdiction over HHS met the requirement of § 9(c)(2).   MARG contends that NIOSH should have filed the charter with the House Labor Committee (renamed in 1997 the Committee on Education and Workforce).   MARG notes that the agency "to whom [BSC] reports" is NIOSH, and the Labor Committee has jurisdiction over NIOSH.

### A.

NIOSH claims that MARG lacks standing to sue for improper filing because it cannot show that it suffered an "injury in fact" as a result of NIOSH's filing BSC's charter with the wrong congressional committee.   Under *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992), to establish standing a plaintiff must show that he has suffered "an invasion of a legally protected interest" that is both "concrete and particularized" and "actual or imminent, not 'conjectural' or 'hypothetical.'"

In addition, NIOSH argues, MARG cannot meet the "prudential" standing requirement "that a plaintiff's grievance must arguably fall within the zone of interests protected or regulated by the

statutory provision or constitutional guarantee invoked in the suit." *See Bennett v. Spear*, 520 U.S. 154, 162 (1997).   NIOSH insists that FACA's requirement that advisory committees file their charters with the appropriate congressional committees is intended to benefit *Congress*, not constituents, and that MARG therefore does not arguably fall within the zone of interests of that provision.

### 1.

MARG meets the jurisprudential standing requirement because it has suffered an injury in fact.  FACA is designed to ensure that advisory committees are fairly constituted and properly monitored so that they will provide sound advice.[3]  The requirement to file with the committee having legislative jurisdiction over the agency to whom the committee reports is central to FACA's purpose of ensuring accountability, for FACA charges each standing committee with the responsibility to engage in intense monitoring of the advisory committees under it.[4]  Obviously, if the charters of

---

[3] *See* 5 U.S.C. App. 2 § 2(b)(5) (finding and declaring that "the Congress and the public should be kept informed with respect to the number, purpose, membership, activities, and cost of advisory committees"); *Public Citizen v. United States Dep't of Justice*, 491 U.S. 440, 453 (1989) (noting that public and congressional scrutiny is intended to further FACA's overall objective of avoiding the "expenditure of public funds for worthless committee meetings and biased proposals").

[4] FACA provides that each standing committee of the House and Senate must make

> a continuing review of the activities of each advisory committee
> under its jurisdiction to determine whether such advisory committee
> should be abolished or merged with any other advisory committee,
> whether the responsibilities of such advisory committee should be
> revised, and whether such advisory committee performs a necessary
> function not already being performed.  Each such standing committee
> shall take appropriate action to obtain the enactment of legislation
> necessary to carry out the purpose of this subsection.

(continued...)

advisory committees are filed with the wrong congressional committees, the monitoring endeavor is thwarted.

Hence, NIOSH's mistake prevented effective congressional monitoring of BSC. The mines affected by the diesel study have a compelling interest in ensuring that the study's results are accurate,[5] and the alleged FACA violation, which made it harder for Congress to scrutinize BSC's activities, increased the likelihood that the results of the study will be inaccurate. Consequently, MARG did suffer an injury in fact.[6]

2.

MARG also has "prudential" standing, and NIOSH's assertion to

---

[4](...continued)
5 U.S.C. App. 2 § 5(a).

[5] Owners of the selected mines are required to participate in the study, *see* 30 U.S.C. §§ 813, 818 (provisions of the Federal Mine Safety and Health Act), and thus to submit to intrusive, extensive, and burdensome examination of their records and facilities. They have a strong interest in ensuring that the data collected as a result of their cooperation will be interpreted and analyzed in a way that will provide sound results, because (1) new regulations will be proposed and promulgated on the basis of the study's findings; (2) mine operators need reliable information to help them design and implement employee health programs; and (3) there is a potential for tort litigation resulting from the study, because NIOSH plans to provide notification of study results and risk assessments to all 8,000 studied individuals (and others).

[6] MARG's injury—a decrease in the ease with which Congress could monitor BSC—is concrete, even if it is widely shared.

> [W]here a harm is concrete, though widely shared, the Court has found "injury in fact."  Thus the fact that a political forum may be more readily available where an injury is widely shared . . . does not, by itself, automatically disqualify an interest for Article III purposes.  Such an interest, where sufficiently concrete, may count as an "injury in fact."

*Federal Election Comm'n v. Akins*, 524 U.S. 11, __, 118 S. Ct. 1777, 1786 (1998) (holding that individual voters have constitutional and statutory standing to seek redress of violations of federal election law).  Moreover, NIOSH's arguments about standing, if accepted, would convert FACA from a statute binding on the agency to one that is merely hortatory.

the contrary is based on a misunderstanding of the "zone of
interests" test.  NIOSH claims that MARG lacks prudential standing
because the statutory requirement was "intended for the benefit of
the congressional committees" and not "for the benefit of" the
members of MARG.  In evaluating whether plaintiffs have prudential
standing, however, courts "should *not* inquire whether there has
been a congressional intent to benefit the would-be plaintiff."
*National Credit Union Admin. v. First Nat'l Bank & Trust Co.*,
522 U.S. 479, ___, 118 S. Ct. 927, 933 (1998) (emphasis added).

> [I]n applying the "zone of interests" test [for pruden-
> tial standing], we do not ask whether, in enacting the
> statutory provision at issue, Congress specifically
> intended to benefit the plaintiff.  Instead, we first
> discern the interests "arguably . . . to be protected" by
> the statutory provision at issue; we then inquire whether
> the plaintiff's interests affected by the agency action
> in question are among them.

*Id.*, 522 U.S. at ___, 118 S. Ct. at 935.

The protected interest is to ensure congressional scrutiny of
advisory committees, to avoid advice that is "biased" and/or of
little value.  The miners that are members of MARG have an interest
in avoiding biased or valueless advice, and that interest is easily
among those "arguably . . . to be protected" by FACA.  If FACA does
not protect MARG from actions of unauthorized committees, then the
statute is aspirational, at best.


                                 B.

     FACA provides that "[n]o advisory committee shall meet or take
any action until an advisory committee charter has been filed
. . . with the head of the agency to whom any advisory committee

                                  8

reports and with the standing committees of the Senate and of the House of Representatives having legislative jurisdiction of such agency." 5 U.S.C. App. 2 § 9(c)(2).   FACA defines "agency" as "*each authority* of the Government of the United States, *whether or not it is within or subject to review by another agency*."[7]   BSC exists for the sole purpose of giving advice to NIOSH,[8] and it "reports to" NIOSH, not HHS.   Under this definition, NIOSH is the relevant agency, despite the fact that it is "within . . . another agency," namely HHS.   Hence, NIOSH should have filed BSC's charter with the committee possessing jurisdiction over NIOSH (the House Labor Committee), and because it did not do so, BSC could not lawfully "meet or take action."   *See* 5 U.S.C. App. 2 § 9(c)(2); 41 C.F.R. § 191.6-1013(a)(1) (1997).

NIOSH asserts, and the district court apparently found, that HHS, not NIOSH, has jurisdiction over BSC.   NIOSH notes that neither NIOSH nor any other HHS component can create a FACA committee without the express approval of the Secretary of HHS. While the Secretary may delegate this authority to a component of the Department, the Secretary does retain the primary authority to create FACA committees.

Similarly, the Secretary approves the renewal, amendment, or termination of federal advisory committees within the department

---

[7] *See* 5 U.S.C. App. 2 § 3(3) (FACA provision stating that agency will have same meaning as in 5 U.S.C. § 551(1)); 5 U.S.C. § 551(1) (defining agency) (emphasis added).

[8] *See, e.g.*, 48 Fed. Reg. 8588 (Mar. 1, 1983) (stating that BSC is established to provide "advice and guidance to the Director, NIOSH").

unless that authority has been delegated by the Secretary or vested by statute in another official.  In addition, the secretary of BSC testified that BSC was a departmental committee, and the charters for BSC were signed by the HHS Secretary or by someone to whom the Secretary had delegated authority.  NIOSH argues that these facts, taken together, show that BSC is a committee of HHS, not NIOSH.

We disagree.  The statute requires filing the charter "with the head of the agency *to whom any advisory committee reports* and with the standing committees of the Senate and of the House of Representatives having legislative jurisdiction of *such agency.*" 5 U.S.C. App. 2 § 9(c).  This language indicates that the relevant inquiry is not "who may form the committee?" but "to whom does the committee report?"

BSC reported to NIOSH, not HHS.  NIOSH admitted as much when it stated in its brief that "it is clear from the record that the BSC is a FACA committee of HHS, *established to provide advice to NIOSH . . . .*"  The brief also admitted that BSC (1) "primarily offers a broad critique of the agency's [NIOSH's] research agenda," (2) "provides ongoing . . . advice to NIOSH . . . concerning its entire range of research activities across many different industries," and (3) has provided advice to NIOSH on "countless matters."   Moreover, the fact that the National Cancer Institute ("NCI")—another separate agency within HHS—has its own "NCI BSC" that provides advice only to NCI, suggests that the NIOSH BSC was established to provide advice to NIOSH, not HHS.  *See* 62 Fed. Reg. 34762 (June 27, 1997).  Accordingly, BSC "reports" to

NIOSH, and NIOSH violated § 9(c) in failing to file BSC's charter with the House Labor Committee.

### III.

MARG contends that BSC's authorization was not properly renewed.   Under § 14(a)(2)(A) of FACA, an advisory committee's authority expires after two years unless the committee is "renewed . . . by appropriate action prior to the end of such period." 5 U.S.C. App. 2 § 14(a)(2)(A).   The General Services Administration ("GSA"), acting under its authority to prescribe binding management controls applicable to advisory committees,[9] has promulgated rules defining the "appropriate action" necessary to renew or re-establish an advisory committee.[10]

MARG contends that NIOSH failed to abide by these rules and that BSC's advisory activities therefore violated FACA.[11]   MARG,

---

[9] FACA requires the Administrator of GSA to prescribe "administrative guidelines and management controls applicable to advisory committees."   5 U.S.C. App. 2 § 7(c).   All agencies are to follow these regulations.   See 41 C.F.R. § 101-6.1002 (1997).   See also 5 U.S.C. App. 2 § 7(a)) (stating that GSA shall be responsible for all matters related to advisory committees.).

[10] The agency must publish notice in the Federal Register when an advisory committee "is being established, used, re-established, or renewed."   41 C.F.R. § 101-6.1015(a) (1997).   Notice of establishment or re-establishment must be given fifteen days before the charter is filed, and notice of renewal must be given, at the latest, contemporaneously with the filing.   See 41 C.F.R. § 101-6.1015(a)(2) (1997).   The regulation does not authorize retroactive notice of renewal or re-establishment.

[11] NIOSH gave Federal Register notice of the initial establishment of BSC in 1983, see 48 Fed. Reg. 8588 (Mar. 1, 1983), and a re-establishment notice was filed in 1991, extending BSC's authority until February 3, 1993, see 56 Fed. Reg. 14939 (Apr. 12, 1991).   After this date, however, no renewal or re-establishment notice appeared in the Federal Register until April 9, 1997.   The notice made on that date purported to re-establish BSC as of February 3, 1997.   MARG contends that, because the regulations do not permit retroactive re-establishment, see supra note 10, BSC was not properly re-established until April 9, 1997, and that, even if retroactive re-establishment were permitted, BSC would not have been
(continued...)

however, lacks standing to raise the issue of inadequate notice of renewal or re-establishment, because it has failed to produce evidence of an injury in fact stemming from NIOSH's alleged failure to comply with GSA's notice rules.  MARG has not shown that NIOSH's alleged failure properly to renew or re-establish BSC caused MARG's members to suffer "an invasion of a legally protected interest" that is both "concrete and particularized," and "actual or imminent, not 'conjectural' or 'hypothetical.'"  *See* *Lujan*, 504 U.S. at 560.

Even if BSC did not publish its charter renewal notice in the Federal Register in a timely fashion, it is undisputed that MARG and the general public had actual notice that BSC was operational and was going to hold a meeting on January 14, 1997, to peer review the Diesel Protocol.  The meeting was announced in the Federal Register nearly a month in advance.  *See* 61 Fed. Reg. 66052 (Dec. 16, 1996).  MARG members attended the January 14, 1997, meeting and made a lengthy presentation.  At the meeting, NIOSH specifically announced that the next scheduled BSC gathering would take place on May 9, 1997 (subsequently changed to April 30, 1997), and notice of that meeting was timely published.

Thus, MARG and other interested parties had actual notice that the BSC was continuing to operate; indeed, they were informed of, and invited to, every meeting of the committee.  Because MARG was included in all meetings, and there is no indication that public

_____

[11] (...continued)
properly established at the time of the January 14, 1997 meeting.

monitoring of BSC was significantly thwarted by any technical violations of the GSA's notice rules, there is no evidence that MARG members suffered any injury in fact, and they therefore lack standing to assert the claim at hand.

## IV.

MARG argues on two grounds that BSC is not properly constituted to perform the tasks assigned to it and is thereby in violation of FACA. MARG first asserts that BSC is not chartered to provide peer review.[12]  Next, it contends that, in light of the sophisticated peer review NIOSH is seeking, BSC is neither "adequate[ly] staff[ed]" nor "fairly balanced in terms of . . . functions to be performed," as FACA requires.[13]  *See* 5 U.S.C. App. 2 § 5(b)(5) (adequate staff); § 5(b)(2) (functional balance).

### A.

MARG insists that BSC's charter does not permit it to provide peer review.  The charter does not mention peer review—a term of art—and the general language in the charter is not, MARG asserts, broad enough to cover that function.  The charter states that the group shall, *inter alia*,

> provide guidance on [NIOSH's] research activities related to developing and evaluating hypotheses, systematically

---

[12] Interpreting a charter is akin to interpreting a contract or statute, so we review this issue *de novo*.  *See Reich*, 55 F.3d at 1045.

[13] Whether an advisory committee is "adequate[ly] staff[ed]" and "fairly balanced in terms of . . . functions to be performed" is a mixed question of law and fact, which we review *de novo*.  *See Salazar v. Johnson*, 96 F.3d 789, 791 (5th Cir. 1996).

documenting findings, and disseminating results . . . [and] shall [] evaluate the degree to which the research activities of [NIOSH] conform to those standards of scientific excellence appropriate to Federal scientific institutions in accomplishing objectives in occupational safety and health.

MARG contends that this language is not specific enough to cover the highly specialized scientific function BSC was asked to perform: "'[P]eer review' is not just 'advice,' and the Diesel Protocol is not a 'program' or an 'activity.'"  In addition, MARG observes that BSC has never engaged in peer review in its fifteen-year history, and its annual report[14] and January 14, 1997, meeting agenda[15] reveal that peer review is not the sort of activity it normally undertakes.   MARG reasons that because BSC is not

---

[14] In its 1995 Annual Report, BSC listed the following accomplishments, none of which included peer review of NIOSH research projects:

> Guidance was solicited and received from committee members on the Institute's research programs to ensure scientific quality, timeliness, and efficacy.  At the four meetings this year many issues were discussed and advice received that will enhance NIOSH programs, such as increasing intramural research efforts, expanding the NIOSH constituency, prevention of musculoskeletal disorders, strengthening relations with the World Health Organization and the International Labor Organization, reducing turn-around time for criteria documents, and improving involvement in evaluating changes in the work force, work practices, and workplace environment.

[15] The meeting agenda illustrates how different peer review is from the activities NIOSH normally undertakes:

> [A] report from the Director of NIOSH and reports on the January NIOSH/OSHA effective ergonomics practices conference; NIOSH construction and agriculture programs; women's safety and health at work; the National Occupational Research Agenda; review of the Health Hazard Evaluation Program; and future activities of the Board.

> In addition, the Board will consider the August 1995 draft protocol for the NIOSH/National Cancer Institute (NCI) [diesel exhaust] study.  The Board will provide NIOSH with an assessment of the scientific quality of the draft protocol, including a review of the stated objectives of the study and the methods proposed to achieve those objectives.

61 Fed. Reg. 66052 (Dec. 16, 1996).

chartered to provide peer review, and because each advisory committee must have a charter that includes a statement of duties and functions, *see* 5 U.S.C. App. 2 § 9(c)(2)(F), BSC is not authorized to provide peer review.

The language in BSC's charter is sufficiently broad to cover peer review. Peer review of a study is "advice" on a "research program"—something the charter expressly authorizes. Simply because peer review is a special kind of advice, and the diesel study a special type of research program, does not change the fact that, in providing peer review, BSC members are advising NIOSH on its research program. "Advice" plainly encompasses peer review, and "research program" plainly encompasses particular studies.[16]

It is irrelevant that BSC has not heretofore provided peer review. The language of its charter determines the charter's scope, which does not shrink over time just because BSC does not immediately engage in all the permitted activities.

B.

BSC also was functionally balanced and adequately staffed to perform the peer review tasks it was assigned. FACA requires that advisory committees be "fairly balanced in terms of . . . the functions to be performed," 5 U.S.C. App. 2 § 5(b)(2), and have

---

[16] Moreover, if there were some ambiguity in these terms, the agency's interpretation of its own committee's charter would be entitled to deference. *See Citizens for Fair Util. Regulation v. United States Nuclear Regulatory Comm'n*, 898 F.2d 51, 54 (5th Cir. 1990).

"adequate staff," 5 U.S.C. App. 2 § 5(b)(5).[17]   In its implementing regulations, GSA has required agencies establishing or renewing an advisory committee to have a "plan" to attain "fairly balanced membership . . . as appropriate to the nature and functions of the committee."   41 C.F.R. § 101-6.1007(b)(2)(iii) (1997).   Among the elements of this plan is the requirement that "[c]ommittees requiring technical expertise should include persons with demonstrated professional or personal qualifications and experience relevant to the functions and tasks to be performed."[18]   41 C.F.R. § 101-6.1007(b)(2)(iii) (1997).

1.

NIOSH avers that FACA's fair balance and adequate staffing requirements are not justiciable.   The weight of the caselaw is to the contrary, however, so we conclude that the functional balance and adequate staffing requirements, while subject to a deferential standard of review, are justiciable.

Judicial review of an agency's compliance with a statute is precluded when the statute is "drawn so that a court would have no meaningful standard against which to judge the agency's exercise of

---

[17] Although § 5(b), which includes the functional balance and adequate staffing requirements, applies by its own terms to committees established by Congress, § 5(c) applies all relevant requirements of § 5(b) to advisory committees established by agencies.   *See* 5 U.S.C. App. 2 § 5(c).

[18] When the function of a committee changes, the plan must change to reflect newly-needed expertise.   HHS's General Administrative Manual ("GAM") requires that the request for renewal of a charter must include a discussion of any "changes between the current and the proposed [renewal] charter," including "any significant change in the committee's function" or "in expertise required by members."   GAM § 9-00-70(G)(2)(c)(1).

discretion." *Heckler v. Chaney*, 470 U.S. 821, 830 (1985).[19]   NIOSH
contends that FACA's command that an agency "require the membership
of the advisory committee to be fairly balanced in terms of the
points of view represented and the functions to be performed,"
5 U.S.C. App. 2 § 5(b)(2), is nonjusticiable because the statute
lays out no standards for determining whether a committee is
"fairly balanced."

NIOSH cites a concurring opinion by Judge Silberman, who
observed that "[t]he relevant points of view on issues to be
considered by an advisory committee are virtually infinite."
*Public Citizen v. Nat'l Advisory Committee on Microbiological
Criteria for Foods*, 886 F.2d 419, 426 (D.C. Cir. 1989) (per curiam)
(Silberman, J., concurring).   He thus opined that the task of
determining what is a fair balance is "a political one" that is
nonjusticiable.   *Id.*[20]

We conclude that FACA's requirements that advisory committees
be fairly balanced and adequately staffed are justiciable.   Relying
primarily on Judge Silberman's concurring opinion, NIOSH fails to
note that the other two judges *disagreed* with Judge Silberman and

---

[19] *See, e.g., Brazos Elec. Power Coop., Inc. v. Southwestern Power Admin.*,
819 F.2d 537, 543-44 (5th Cir. 1987) (holding that action of federal agency in
allocating hydroelectric power was not judicially reviewable because the
statutory language requiring the agency to "transmit and dispose of such power
and energy in such manner as to encourage the most widespread use thereof" did
not provide a meaningful standard by which to judge the propriety of the agency's
actions).

[20] *Accord Fertilizer Inst. v. EPA*, 938 F. Supp. 52, 53 (D.D.C. 1996)
(holding FACA's "fair balance" requirement to be nonjusticiable).

found the statutory provisions to be justiciable.[21]

Another panel of that circuit has concluded that the words chosen by Congress in § 5 of FACA were intended to be enforced by the courts.   In *National Anti-Hunger Coalition v. Executive Committee,* 711 F.2d 1071 (D.C. Cir. 1983), the court explained that courts may enforce FACA's "point-of-view balance" requirement—a "balance" requirement that is even more subjective than is the functional balance requirement:[22]

> [T]he legislative history makes clear [that] the "fairly
> balanced" requirement was designed to ensure that persons
> or groups directly affected by the work of a particular
> advisory committee would have some representation on the
> committee.   When the requirement is ignored, therefore,
> persons having a direct interest in the committee's
> purpose suffer injury-in-fact sufficient to confer
> standing to sue.

*Id.* at 1074 n.2 (citation omitted).   Citing this passage, Judge Edwards stated in his separate opinion in *Microbiological Criteria* that "[t]he question of justiciability of claims under section 5 of FACA is thus not an open issue in this circuit."   *Microbiological Criteria,* 886 F.2d at 433 (Edwards, J., concurring in part and dissenting in part).   Indeed, *National Anti-Hunger Coalition* establishes that point-of-view balance is a justiciable require-

---

[21] *See Microbiological Criteria,* 886 F.2d at 434 (Edwards, J., concurring in part and dissenting in part) ("It does not matter that the 'fairly balanced' requirement falls short of mathematical precision in application, or that it may involve some balancing of interests by the agency.   The presumption in favor of judicial review is not altered in the face of a diffuse statutory directive."); *id.* at 423-25 (Friedman, J., concurring).

[22] The functional balance and point-of-view balance requirements are articulated together in the statute:   "[An agency shall] require the membership of the advisory committee to be fairly balanced in terms of the points of view and the functions to be performed by the advisory committee."   5 U.S.C. App. 2 § 5(b)(2).

ment, and it would seem that the requirements of functional balance and avoidance of inappropriate influence—requirements that are more "objective" than is point-of-view balance—would, *a fortiori*, be justiciable.[23]

Finally, NIOSH's brief fails to mention the district court's opinion on remand in *National Anti-Hunger Coalition v. Executive Committee*, 566 F. Supp. 1515 (D.D.C. 1983) (order modifying judgment), a case directly on point, in which the court found an advisory committee's work to be illegal and *ultra vires* because the committee was not balanced in light of the functions that had been newly assigned to it.  That opinion demonstrates that the functional balance requirement is justiciable, particularly in a situation in which newly-added tasks raise questions about whether the committee remains functionally balanced.[24]

---

[23] District courts within the District of Columbia Circuit have strayed from the *Microbiological Criteria* panel's apparent holding.  *See, e.g.*, *Fertilizer Inst. v. EPA*, 938 F. Supp. 52, 54 (D.D.C. 1996) (finding the fair balance requirement non-justiciable "[o]n the basis of the record" in that case); *Public Citizen v. Dep't of HHS*, 795 F. Supp. 1212, 1221-22 (D.D.C. 1992) ("[T]here are no meaningful standards by which the Court can review whether the FDA Advisory Committee is 'fairly balanced in terms of the points of view represented and the functions to be performed.'").  The *Fertilizer Institute* court believed the question of justiciability was an open one because of "the alternative conclusions reached by Judges Silberman and Edwards in [*Microbiological Criteria*]."  *Fertilizer Institute*, 938 F. Supp. at 54 n.3.  The court, however, did not explain why it ignored Judge Friedman's tie-breaking conclusion that the fair balance requirement is justiciable.  Regardless, we follow our sister circuit's lead and conclude that FACA's § 5 requirements are justiciable.

[24] While the functional balance and adequate staffing requirements are justiciable, they are subject to highly deferential review.  *See Microbiological Criteria*, 886 F.2d at 424 (Friedman, J., concurring) ("[D]etermination of how the 'fairly balanced' membership of an advisory committee . . . is to be achieved, necessarily lies largely within the discretion of the official who appoints the committee."); *id.* at 434 (Edwards, J., concurring in part and dissenting in part) (noting that "the difficulty of determining what precisely constitutes a 'fair balance' may incline courts to be deferential in reviewing the composition of advisory committees").

2.

In considering whether a committee is fairly balanced in terms of function, courts naturally have looked first at the functions to be performed.[25]  Similarly, courts should consider the functions a committee is to perform in evaluating whether it meets FACA's adequate staff requirement.  We thus evaluate BSC's functional balance and staffing adequacy in light of the specialized peer review functions the committee was asked to undertake.  Affording appropriate deference to the appointing officials, *see supra* note 24, we conclude that BSC is functionally balanced and adequately staffed to peer review the Diesel Protocol.

a.

NIOSH contends that the proper inquiry is whether BSC is fairly balanced in terms of *all* the functions it is to perform under its charter, not when viewed simply as a peer reviewer of the Diesel Protocol.  The agency believes it is not necessary to re-analyze BSC's functional balance and staffing adequacy after the committee has been assigned new tasks.  NIOSH reasons that, while MARG says BSC was not fairly balanced in terms of function after it was given the task of peer-reviewing the diesel study protocol, the statute requires fair balance in terms of all functions, not just newly added ones.  NIOSH then asserts that BSC is appropriately

---

[25] *See National Anti-Hunger Coalition v. Executive Committee*, 566 F. Supp. 1515 (D.D.C. 1983) (order modifying judgment) (committee work was *ultra vires* and illegal for lack of balanced committee in light of functions newly assigned to committee).

balanced to perform all its functions and that the court should not read the fair-balance requirement to mandate re-balancing every time an advisory committee is charged with a new task that would fit under its charter.  NIOSH cites *Public Citizen v. Department of HHS*, 795 F. Supp. 1212, 1221 (D.D.C. 1992), in which the court queried, "Is the Court to engage in continuous oversight so that for each separate 'function' that a particular committee engages in, the Court can reassess whether the committee was 'fairly balanced' to engage in that function?"

We reject the analysis NIOSH suggests and instead adopt the view that assigning new functions to an advisory committee may render it functionally out of balance.  Accordingly, the addition of peer review functions to BSC's duties *could have* caused it to fail to meet the functional balance requirement of § 5.  Precedent and reason support this approach.[26]  Under FACA, agencies should not be permitted to assign advisory committees functions that the committee members do not have the expertise to perform.  Otherwise, an agency could easily evade FACA by listing, in its advisory committee's charter, functions that are so broad as to be meaning-less or are simply different from the functions actually assigned.

b.

Nonetheless, we conclude that BSC complies with the functional

---

[26] *See National Anti-Hunger Coalition v. Executive Committee*, 566 F. Supp. 1515 (D.D.C. 1983) (order modifying judgment) (holding that committee's work was *ultra vires* and illegal because of lack of functional balance in light of functions newly assigned to it).

balance and adequate staffing requirements of FACA § 5, even when the new peer review tasks are considered.  Agencies have considerable discretion to determine whether an advisory committee is functionally balanced and adequately staffed, *see supra* note 24, and NIOSH's conclusion that BSC was appropriately constituted to peer review the Diesel Protocol is sound.

As the district court noted, the membership of BSC includes scientists with expertise in many fields related to the subject matter of the Diesel Study: "epidemiology, toxicology, chemistry, industrial hygiene, biomarkers and biostatistics."  MARG asserts that broad scientific expertise is not enough in this case, for the function of peer-reviewing the diesel study protocol requires an in-depth knowledge of diesel processes, a knowledge possessed by few individuals.  We disagree.

The Diesel Protocol is, after all, simply a plan for how to conduct a scientific study.  The membership of BSC thus needed expertise *in the scientific method*, which it undoubtedly possessed. Given the deference with which we review an agency's determination that its advisory committee is functionally balanced and adequately staffed, we affirm the conclusion that BSC meets § 5's functional balance and adequate staff requirements.

V.

MARG attacks what it perceives as BSC's lack of "point-of-view

22

balance."[27]   FACA § 5(b)(2) states that each advisory committee
must have membership that is "fairly balanced in terms of the
points of view represented."   5 U.S.C. App. 2 § 5(b)(2).   The
regulations implementing FACA require that the agency overseeing an
advisory committee have a "plan" to ensure "fairly balanced
membership" and to ensure that "the agency will consider a cross-
section of those directly affected, interested, and qualified, as
appropriate to the nature and functions of the committee."   *See*
41 C.F.R. § 101-6.1007(b)(2)(iii) (1997).   MARG argues that when
NIOSH added the new function of providing peer review of a
specific, highly specialized study, FACA and the implementing
regulations required NIOSH to ensure participation by those
directly affected by the committee's work, to guarantee point-of-
view balance.

### A.

As it did with the functional balance and adequate staffing
requirements, NIOSH first claims that FACA's requirement of a fair
balance of points of view is nonjusticiable.   For the reasons we
have articulated in response to NIOSH's claim that FACA's func-
tional balance requirement is nonjusticiable, we disagree.   In
particular, it is worth repeating that "[w]hen the [point-of-view
balance] requirement is ignored, persons having a direct interest
in the committee's purpose suffer injury-in-fact sufficient to

---

[27] Whether an advisory committee's membership is balanced in terms of
point-of-view, as FACA § 5(b)(2) requires, is a mixed question of law and fact,
which we review *de novo*.  *See Salazar*, 96 F.3d at 791.

23

confer standing to sue." *National Anti-Hunger Coalition*, 711 F.2d at 1074 n.2.   If aggrieved individuals may sue to enforce the requirement, then the requirement must be justiciable.

B.

The district court correctly decided that BSC had complied with the point-of-view balance requirement.   The task of the committee—providing *scientific* peer review—is politically neutral and technocratic, so there is no need for representatives from the management of the subject mines to serve on the committee.   BSC, charged with the scientific task of evaluating a study protocol, was not called on to make policy decisions about mine regulation. The court thus properly concluded that FACA does not require BSC to include management representatives from the mines.

*National Anti-Hunger Coalition*, 711 F.2d at 1074, supports this conclusion.   There, the court upheld as "unimpeachable" the conclusion that a committee appointed to study social service programs was fairly balanced, even though "virtually every member of the Executive Committee was an executive of a major corporation and . . . no public interest representatives or beneficiaries of federal feeding programs had been appointed."   The court based its finding of fair point-of-view balance on the fact that the committee's goal was to "apply private sector expertise to attain cost-effective management in the federal government."   *Id*.   Given that goal, public interest representatives and welfare beneficia-

24

ries were not needed.[28]

In arguing that BSC must include representatives of the affected mines, MARG relies on a statement in a footnote from *National Anti-Hunger Coalition*: "[T]he 'fairly balanced' require-ment was designed to ensure that persons or groups directly affected by the work of a particular advisory committee would have some representation on the committee." 711 F.2d at 1074 n.2. MARG's reliance on that case is misguided. Its central holding is precisely contrary to the position MARG advocates; the court expressly held that an advisory committee with a narrow, technical mandate does not have to include representatives of those who might be affected by the committee's work. See id. at 1074.

MARG insists that it is not calling for non-scientists to be included on a panel charged with giving scientific advice but is arguing only that, among the group of scientific experts,

> there should be one or more highly qualified scientists and scientific consultants employed by, retained by, or at least recommended by the companies and labor groups affected by the study. At the very least, there must be a strong good faith effort to locate, consider, and appoint such experts.

MARG, however, has pointed to no evidence indicating that BSC's membership is somehow biased toward one particular point of view. An entity bringing a point-of-view balance challenge must do more than simply say, "The agency didn't come to us for an expert"; the

---

[28] *See also Microbiological Criteria*, 886 F.2d at 423 (Friedman, J., concurring) ("Since the Committee's function in this case involves highly technical and scientific studies and recommendations, a 'fair balance' of viewpoints can be achieved even though the Committee does not have any members who are consumer advocates or proponents of consumer interests.").

challenger must make some kind of *prima facie* showing that the membership of the committee is biased in its point of view.

## VI.

MARG contends that BSC is not properly constituted to avoid inappropriate influence.[29]  Section 5(b)(3) of FACA requires federal agencies to make "appropriate provision[] to assure that the advice and recommendations of the advisory committee will not be inappropriately influenced by the appointing authority or by any special interest, but will instead be the result of the advisory committee's independent judgment."   5 U.S.C. App. 2 § 5(b)(3).   MARG asserts that the potential for inappropriate influence by the appointing authority is acute in the case of the diesel study peer review, for NIOSH and HHS have an interest in finding that diesel exhaust poses a danger; if they so find, they likely will be able to expand their regulatory authority, budgets, and prestige.

MARG points out that ten of fifteen BSC members who attended the January 14, 1997, meeting are former HHS employees or fellows. At that time, eight members (a voting majority) were recipients of a total of more than $4 million in active NIOSH/NCI grants, and two-thirds had published or co-authored professional papers and research articles with each other or with high-ranking NIOSH or NCI officials or the researchers involved in the diesel study.   In addition, two members of BSC who participated in the meeting were,

---

[29]  Whether an advisory committee is properly constituted to avoid inappropriate influence is a mixed question of law and fact that we review *de novo*.  *See Salazar*, 96 F.3d at 791.

at that time, actively negotiating jobs with OSHA and EPA—two agencies whose regulatory authority likely will expand if the study concludes that diesel exhaust is a danger.[30]

### A.

NIOSH did not fail to manage BSC to avoid inappropriate influence when it permitted participation by former HHS employees and grant recipients.  The fact that some BSC members have ties to HHS does not in itself render them susceptible to improper influence.

NIOSH is the major sponsor of occupational safety and health research, and it is therefore not surprising that BSC, whose members are selected because they are experts in that field, would include some persons who had worked for or received a grant from HHS.  Working for or receiving a grant from HHS, or co-authoring a paper with a person affiliated with the department, does not impair a scientist's ability to provide technical, scientific peer review of a study sponsored by HHS or one of its agencies.[31]  Moreover, if HHS were required to exclude from peer review committees all

---

[30] As before, NIOSH first argues that MARG's claim is nonjusticiable because the statute does not provide adequate standards to guide courts in determining whether "appropriate provisions" have been taken to avoid "inappropriate influence."  *See Microbiological Criteria*, 886 F.2d at 429-30 (Silberman, J., concurring).  Again, we follow the *Microbiological Criteria* majority and hold that § 5's inappropriate-influence prohibition is justiciable. *See id.* at 425 (Friedman, J., concurring); *id.* at 432-34 (Edwards, J., concurring in part and dissenting in part).

[31] *See, e.g., Public Citizen v. National Advisory Committee on Microbiological Criteria for Foods*, 708 F. Supp. 359, 364 (D.D.C. 1988), *aff'd*, 886 F.2d 419 (D.C. Cir. 1989) (rejecting assertion that all members of a FACA committee who were employed by the food industry or who ever worked as consultants to the industry were anti-regulatory).

scientists who somehow had been affiliated with the department, it would have to eliminate many of those most qualified to give advice.

### B.

While we are more troubled by the fact that BSC's membership included two persons who were actively negotiating for employment with agencies whose regulatory authority will be directly affected by the results of the diesel study, we agree with the district court that this fact alone does not indicate a failure to guard against inappropriate influence.  We disagree with NIOSH's claim that there is no potential for "inappropriate influence" until the committee member is actually employed by the other agency,[32] for it is while a person is negotiating for a new job that the potential for inappropriate influence is the greatest.  Nevertheless, we decline to reverse the determination that BSC complied with § 5(b)(3).  Only two of fifteen BSC members were negotiating with other agencies, and while those agencies may have an interest in the diesel study's producing a particular result, that interest is not strong enough to cause BSC to be inappropriately influenced.

### VII.

---

[32]  NIOSH claims that it complied with FACA's command to avoid "inappropriate influence . . . by any special interest" because it required one employee to resign after he had accepted a job with EPA, and the employee did not accept the job until after the January 14 meeting.  As for the other BSC member, there was no impropriety, NIOSH avers, because, although the member was negotiating a job with OSHA at the time of the January 14 meeting, she had neither received nor accepted an employment offer from OSHA at that time.

MARG claims that BSC failed on three counts to abide by its charter and the rules set out in HHS's GAM.[33]   First, the January 14 meeting involved twenty participants, and the BSC charter limits board membership to fifteen.   Second, the BSC failed to provide geographic diversity, as required by GAM § 9-00-80(B)(3).   Most of the members of BSC are from the East Coast.   Finally, BSC did not abide by GAM § 9-00-80(B)(4)(d), which prohibits service on an advisory committee by two persons affiliated with the same institution in the same city.

## A.

The district court did not err in finding that BSC and NIOSH complied with the GAM.[34]   The BSC does have broad geographic

---

[33]   MARG's claims of noncompliance with agency regulations and charter provisions raise questions of law, which we review de novo.   *See Reich*, 55 F.3d at 1045).

[34]  Even if NIOSH did technically violate the GAM, MARG cannot state a claim for relief, because the manual is intended solely to govern HHS's internal administration and does not confer any judicially enforceable benefits or rights.  "[A]gencies are not required, at the risk of invalidation of their action, to follow all of their rules, even those properly classified as 'internal.'"  *United States v. Caceres*, 440 U.S. 741, 754 n. 18 (1979).   *See also Shalala v. Guernsey Mem. Hosp.*, 514 U.S. 87, 99 (1995) (noting that interpretive rules do not have the force and effect of law); *Central Freight Lines v. United States*, 669 F.2d 1063, 1070 (5th Cir. 1982) (holding that rule was not enforceable where agency "did not promulgate the rule primarily to confer important procedural rights").

MARG admits that the requirements in the GAM are self-imposed, but it asserts that even where an agency is not obligated to impose limitations on itself, "having done so [the agency] could not, so long as the Regulations remained unchanged, proceed without regard to them."  *Service v. Dulles*, 354 U.S. 363, 388 (1957).  This principle, MARG asserts, applies to policies set out in agency manuals as well as to substantive legislative rules.  *See Morton v. Ruiz*, 415 U.S. 199, 235 (1974).  *A fortiori*, an agency is required, MARG argues, to adhere to management controls Congress has directed it to adopt and follow.

But MARG is reading *Dulles* and *Ruiz* too broadly.  In each, the agency's self-imposed rules affected the rights of individuals.  As the *Ruiz* Court explained, "Where the rights of individuals are affected, it is incumbent upon agencies to follow their own procedures."  *Id*.  The regulations allegedly
(continued...)

representation.   There are two members from California, two from New York, three from Massachusetts, two from Washington, D.C., and one each from Connecticut, Iowa, Maryland, and North Carolina. While the board's composition may be somewhat weighted toward the East Coast, the GAM imposes no strict geographic quotas, but simply calls for a "broad . . . representation of geographic area"—a criterion that BSC meets.   *See* GAM § 9-00-80(B)(3).

The court also did not err in concluding that NIOSH did not violate the GAM provision banning service on an advisory committee by two persons affiliated with the same institution in the same city.   There is sufficient evidence to support a finding that the provision did not apply because BSC had secured a waiver under GAM § 9-00-80(C)(2).

MARG argues that the waiver was not valid because it was not executed in advance of the January 14 meeting.   MARG notes that the printed version of the GAM—the version initially provided to MARG and the district court—stated that a waiver must be made in writing *before* the member is appointed.   The waiver NIOSH secured was obtained on March 28, 1997—*after* the two "same town/same institution" members had been appointed and had participated in the January 14 meeting.

The district court determined, and the record supports, however, that the waiver provision had been amended to permit

---

[34](...continued)
violated here do not affect individual rights by, for example, creating particular expectations and reliance interests, and NIOSH and HHS were thus "not required, at the risk of invalidation of their action, to follow [their internal rules]." *See Caceres*, 440 U.S. at 754.

retroactive execution.  NIOSH provided the court with a version of
the GAM, dated 1995, that included a handwritten change that
deleted the requirement that a waiver request be made prior to
appointment.  While this handwritten amendment may seem question-
able, we cannot conclude that the court clearly erred in finding
that the amendment was *bona fide* and that the waiver therefore was
timely.

### B.

The district court properly refused to see a substantive FACA
violation in the fact that the BSC meeting included more partici-
pants than BSC's charter authorizes.  Section 9(c) of FACA
prescribes information that must be included in an advisory
committee's charter.[35]  The statute does not, however, require the
charter to indicate how many persons may participate on the
committee.

Neither has MARG cited any HHS regulation that imposes such a
requirement.  It simply avers that NIOSH violated a charter
provision it never had to adopt in the first place.  This fact
cannot disturb the finding of "substantial compliance with *all*
applicable regulations."

### VIII.

---

[35] *See* 5 U.S.C. App. 2 § 9(c) (requiring, *inter alia*, the committee's
"official designation," objectives, scope of activity, supporting agency,
estimated annual operating costs, number and frequency of meetings, and
termination date).

MARG contends that the district court erred when it denied injunctive relief because of its conclusion that NIOSH had "substantially complied" with all applicable statutory and regulatory requirements. We review a refusal to grant an injunction for abuse of discretion. *Peaches Entertainment Corp. v. Entertainment Repertoire Assocs., Inc.* 62 F.3d 690, 693 (5th Cir. 1995). In granting or denying injunctive relief, a court abuses its discretion when it (1) relies on clearly erroneous factual findings, (2) relies on erroneous conclusions of law, or (3) misapplies its factual or legal conclusions. *Id.* Because, despite its diligent efforts, the court erred in concluding that NIOSH complied with FACA's congressional filing requirements, we remand for that court to determine the appropriate remedy in light of our legal analysis.

## A.

The fact that an instance of noncompliance with FACA seems trivial and inconsequential should not deter the court from granting some type of injunctive relief. In FACA, Congress made a calculated decision that advisory committees, which wield hefty influence, should be structured a certain way. While some of the strictures imposed by Congress—and, pursuant to delegation, the GSA—may seem trivial, Congress believed the rules were necessary to ensure balanced, rationally-based decision making.[36]

---

[36] While some of FACA's requirements may seem "nit-picky," it is not the court's place to loosen the statute's requirements. "If the straitjacket is too

(continued...)

If the courts do not enforce FACA by enjoining the work product of improperly constituted committees, FACA will be toothless, merely aspirational legislation. "Congress outlined in detail exactly what procedures were to be used [in establishing and utilizing advisory committees], and it is the responsibility of the courts to see that such laws are carried out." *Alabama-Tombigbee Rivers Coalition v. Department of the Interior*, 26 F.3d 1103, 1006 (11th Cir. 1994). If FACA has no teeth, the work product of spuriously formed advisory groups may obtain political legitimacy that it does not deserve. *See Association of Am. Physicians & Surgeons v. Clinton*, 997 F.2d 898, 913 (D.C. Cir. 1993). Hence, some type of injunctive relief is appropriate.

## B.

Nonetheless, the district court need not automatically bar the use of all of the BSC's work product—*i.e.*, grant a "use injunction"—as MARG requests. Courts have differed somewhat on when a use injunction is appropriate; we join the District of Columbia Circuit in concluding that "a use injunction should be the remedy of last resort." *See Natural Resources Defense Council v. Peña*, 147 F.3d 1012, 1025 (D.C. Cir. 1998).

We reject the approach of the Eleventh Circuit, which appears to have adopted a *per se* rule that use of the work product of a committee that violates FACA must be enjoined to preserve incen-

---

[3] [6]   ( . . . c o n t i n u e d )
tight, Congress is free to loosen it." *National Nutrition Foods Ass'n v. Califano*, 603 F.2d 327, 336 (2d Cir. 1979).

tives to abide by FACA's dictates.   That court explained:

> [T]o allow the government to use the product of a tainted
> procedure would circumvent the very policy that serves as
> the foundation of the Act.   . . . We find injunctive
> relief as the only vehicle that carries the sufficient
> remedial effect to ensure future compliance with FACA's
> clear requirements.   Anything less would be tantamount to
> nothing.

*Alabama-Tombigbee*, 26 F.3d at 1107 (citation omitted).

Under this approach, BSC would be enjoined from engaging in further peer review until it meets all of FACA's requirements, and NIOSH would not be permitted to use the "tainted" fruits of prior peer review activities.   While the *per se* rule does exhibit the virtue of simplicity, there occasionally may be FACA violations that are either unintentional or so *de minimis* as not to warrant a court's attention.   The *per se* rule would require a costly injunction to issue even when its deterrence benefits would be minimal.

Instead, we adopt the approach taken in *California Forestry Ass'n v. United States Forest Serv.*, 102 F.3d 609, 614 (1996), which reasons that "an injunction [for a FACA violation] might be appropriate in some cases . . . if the unavailability of an injunctive remedy would effectively render FACA a nullity."   The court remanded to the district court to determine "whether under the circumstances an injunction would promote FACA's purposes."   *Id.*   Similarly, we remand to the district court to fashion an injunctive remedy that will encourage compliance with FACA's strictures while remaining sensitive to its principal purposes of

public accountability and avoidance of wasteful expenditures.[37] Needless to say, the district court has broad discretion in fashioning its injunction.

## IX.

In sum, we affirm the determinations that (1) BSC's charter permits peer review; (2) BSC complies with FACA § 5's functional balance, adequate staffing, and point-of-view balance requirements; (3) BSC is properly constituted to be free from inappropriate influence; and (4) BSC complies with applicable HHS regulations regarding geographic diversity and representation.  We dismiss, for lack of standing, MARG's claim that NIOSH failed properly to renew or re-establish BSC.   We reverse the determination that BSC complies with FACA's congressional filing requirements.  We remand for the district court to fashion an appropriate injunctive remedy in light of the legal analysis presented herein.

AFFIRMED in part, REVERSED in part, and REMANDED.

---

[37] *See Natural Resources Defense Council*, 147 F.3d at 1026 (remanding to the district court to fashion remedy for FACA violation and instructing court to consider principal purposes of FACA, including avoidance of wasteful expenditures and public accountability, before granting injunction preventing the use of material obtained in violation of FACA).

# *United States Court of Appeals*

**FIFTH CIRCUIT**
**OFFICE OF THE CLERK**

**CHARLES R. FULBRUGE III**
**CLERK**

**TEL. 504-589-6514**
**600 CAMP STREET**
**NEW ORLEANS, LA 70130**

June 24, 1999

Mr Robert H Shemwell, Clerk
Western District of Louisiana, Lafayette
United States District Court
300 Fannin Street
Suite 1167
Shreveport, LA 71101

      No. 97-31190 Methane Awareness, et al v. USA; et al
      USDC No. 96-CV-2430

Enclosed, for the district court only, is a certified copy of the
judgment issued as the mandate.

Enclosed, for the district court only, is a copy of the court's
opinion.

Record/original papers/exhibits to be returned.

                Sincerely,

                CHARLES R. FULBRUGE III, Clerk

                By:
                  Shari D. Stewman, Deputy Clerk

cc: (letter only)
    Honorable Richard T Haik Sr
    Mr Joseph L Lemoine Jr
    Mr David Bancroft Robinson
    Mr Mark Bernard Stern
    Mr Carl E Goldfarb

MDT-1